## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Starlion Electronics Distribution, LLC,** | **Case No. 1:24-cv-1186** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **JDS Pro Health LLC, et al.,** | **MEMORANDUM OPINION & ORDER** |
| **Defendants.** | |

Currently pending are the (1) Motion for Judgment on the Pleadings (the "12(c) Motion") of Defendants JDS Pro Health LLC ("JDS Pro"), JDS Labs, LLC ("JDS Labs"), and Damon Roberts ("Roberts") (collectively, the "Defendants") (Doc. No. 15), filed on October 28, 2024, and (2) Motion for Leave to Amend Verified Complaint (the "Motion to Amend") of Plaintiff Starlion Electronics Distribution, LLC ("Plaintiff" or "Starlion") (Doc. No. 21), filed on November 27, 2024.

Also on November 27, 2024, Starlion filed a Brief in Opposition to the 12(c) Motion.  (Doc. No. 22.)  On December 10, 2024, Defendants filed a Reply Brief in support of the 12(c) Motion (Doc. No. 24) and a Brief in Opposition to the Motion to Amend.  (Doc. No. 25.)  On December 17, 2024, Starlion filed a Reply Brief in support of the Motion to Amend.  (Doc. No. 26.)

For the following reasons, Starlion's Motion to Amend (Doc. No. 21) is GRANTED and Defendants' 12(c) Motion is DENIED (Doc. No. 15) as moot.

### I.  Background

#### A.  Factual Allegations in the Verified Complaint

On or around April 10, 2023, Starlion and JDS Pro entered into an Agreement for the Supply of COVID-19 tests (hereinafter "the Agreement").  (Doc. No. 1 at ¶ 10; Doc. No. 1-1.)  Pursuant to the Agreement, Starlion agreed to sell COVID-19 tests ("Tests") to JDS Pro and deliver such Tests to JDS Pro's customers at JDS Pro's request.[1]  (Doc. No. 1 at ¶ 11.)  JDS Pro had 30 days after receiving tracking numbers from Starlion confirming delivery of the Tests to JDS Pro's customers to pay the relevant invoice in full.  (*Id*. at ¶ 13.)  The names and addresses of JDS Pro's customers were provided to Starlion by JDS Pro.  (*Id*. at ¶ 14.)  The Agreement further provided that JDS Pro was responsible for the repayment of any reshipment to JDS Pro's customers due to insufficiency of address or poor data.[2]  (*Id*. at ¶ 16.)

According to Starlion, it had "no knowledge whatsoever about how JDS Pro obtained its customers or the nature of the arrangements between JDS Pro and its customers."  (*Id.* at ¶ 15.)  Rather, "Starlion's sole role with regard to JDS Pro's customers was to deliver the Tests."  (*Id*.)  Starlion was not paid or otherwise compensated by JDS Pro's customers or any governmental agency for its services under the Agreement. (*Id*.) Defendant Roberts, one of two members of JDS Pro alongside Steven Prince ("Prince"), personally guaranteed JDS Pro's payment to Starlion.  (*Id.* at ¶¶ 3(e), 17.)

Starlion made two deliveries and one reshipment of Tests to JDS Pro's customers, each evidenced by an invoice attached as an Exhibit to the Verified Complaint.  (Doc. Nos. 1-2, 1-3, and 1-4.)  Specifically, Invoice 818 indicates that on April 8, 2023, Starlion sold 130,000 Tests to JDS

---

[1] Under the Agreement, JDS Pro was to pay Starlion $3.125.  (*Id*. at ¶ 12.)  The Tests came in packages, each of which contained eight (8) tests. (*Id*.)  As a result, under the Agreement, JDS Pro was required to pay $25 per package.  (*Id*.)

[2] The cost for a reshipment to a JDS Pro customer was $8.60.  (*Id*.)

2

Pro for $3,250,000.00.  (Doc. No. 1 at ¶ 19; Doc. No. 1-2 at PageID# 18.)  Starlion delivered the 130,000 Tests to JDS Pro's customers and provided the relevant tracking numbers to JDS Pro.  (Doc No. 1 at ¶ 20.)  JDS Pro paid Starlion $1,750,000.00 on Invoice 818, leaving an unpaid balance of $1,515,000.00.  (Doc. No. 1 at ¶ 21; Doc. No. 1-2 at PageID# 18.)

Invoice 977 indicates that on May 17, 2023, Starlion sold an additional 106,864 Tests to JDS Pro for $2,671,600.00.  (Doc. No. 1 at ¶ 22; Doc. No. 1-3 at PageID# 20.)  Starlion delivered the 106,864 Tests to JDS Pro's customers and provided the relevant tracking numbers to JDS Pro.  (Doc. No. 1 at ¶ 23.)  However, JDS Pro failed to make any payment on Invoice 977, leaving an unpaid balance of $2,671,600.00.  (*Id*. at ¶ 24.)

Lastly, on June 15, 2023, Starlion sent JDS Pro Invoice 1217 for $89,715.20 for reshipments of Tests to a number of JDS Pro's customers.  (*Id.* at ¶ 25; Doc. No. 1-4 at PageID# 21.)  Starlion provided JDS Pro with the tracking numbers relating to these reshipments.  (*Id*. at ¶ 26.)  JDS Pro failed to make any payment on Invoice 1217, leaving an unpaid balance of $89,715.20.  (*Id*. at ¶ 27.)  Thus, Starlion alleges that, in total, JDS Pro and Roberts owe Starlion $4,276.315.20 on Invoices 818, 977, and 1217.  (*Id.* at ¶ 28.)

Of particular relevance herein, Starlion alleges that JDS Pro and Roberts represented that "JDS Pro would receive proceeds for the Tests and pay Starlion for Invoices 818, 977, and 1217."  (*Id*. at ¶ 51.)  In addition, JDS Pro represented to Starlion that "virtually all of the JDS Pro customers to which Starlion delivered the Tests were covered by private insurance."  (*Id.* at ¶¶ 30, 52.)  JDS Pro's and Roberts' representations were material to Starlion's decision to sell the Tests to JDS Pro.  (*Id*. at ¶ 53.)  Starlion alleges, however, the JDS Pro and Roberts made the representations to Starlion "knowing that they were false."  (*Id*. at ¶ 54.)  Specifically, Starlion alleges, upon information and

3

belief, that "JDS Pro's customers to whom Starlion delivered the Tests were covered by Medicare and Medicaid" – not by private insurance.  (*Id*. at ¶ 55.)  Moreover, while JDS Pro and Roberts represented to Starlion that JDS Pro was "the party buying the Tests from Starlion," it was, in fact, JDS Labs (a separate LLC owned by Roberts) that "invoice[ed] the U.S. federal government (Medicare or Medicaid) for part or all of the Tests JDS Pro bought from Starlion and which Starlion delivered to JDS Pro's customers."  (*Id.* at ¶ 31.)  Indeed, Starlion alleges that "JDS Pro and Roberts used its sister company, JDS Labs, to sell the Tests to the U.S. government (Medicare or Medicaid) and receive the proceeds, thus hindering Starlion's ability to recover on Invoices 818, 977, and 1217 because there is no contract between Starlion and JDS Labs for the Tests."[3]  (*Id.* at ¶ 56.)

Starlion alleges that despite its "several demands" for payment, JDS Pro and Roberts have failed and/or refused to pay the amounts owed to Starlion on Invoices 818, 977, and 1217.  (*Id.* at ¶ 29.)

**B.  Relevant Procedural History**

On July 12, 2024, Starlion filed a Complaint against Defendants JDS Pro, JDS Labs, and Roberts.  (Doc. No. 1.)  Starlion's Complaint sets forth five counts: (1) Breach of Contract against JDS Pro (Count I): (2) Breach of Contract – Guarantee against Roberts (Count II); (3) Unjust Enrichment against JDS Labs and Roberts (Count III);  (4) Fraud against JDS Pro and Roberts (Count IV); and (5) Civil Conspiracy against all three Defendants (Count V).  (*Id.* at ¶¶ 34-64.)

Starlion seeks relief specific to each count.  For its breach of contract claim against JDS Pro, it seeks "damages in the amount of $4,276,315.20 to compensate [Starlion] for JDS Pro's breach of

---

[3] According to Starlion, the United States has reimbursed JDS Labs and/or JDS Pro for some of the Tests Starlion sold to JDS Pro and delivered to JDS Pro's customers.  (*Id*. at ¶¶ 32-33.)

contract." (*Id.* at PageID# 10.) For its breach of guarantee claim against Roberts, Starlion seeks the same amount "to compensate [Starlion] for Roberts' breach of the personal guarantee clause contained in the Agreement." (*Id.* at PageID# 11.) For its unjust enrichment claim, Starlion seeks "[d]amages for unjust enrichment against JDS Labs and Roberts, the exact amount of which will be determined at trial." (*Id.*) For its fraud claim, Starlion seeks "a judgment in favor of Starlion and against Defendants JDS Pro and Roberts, jointly and severally, for fraud in an amount to be determined at trial, and an award of punitive damages, and attorney's fees." (*Id.*) Lastly, for its civil conspiracy claim, Starlion seeks "a judgment in favor of Starlion and against Defendants JDS Pro, JDS Labs, and Roberts, jointly and severally, for civil conspiracy in an amount to be determined at trial, and an award of punitive damages, and attorney's fees," and for all counts, "any such other relief, legal or equitable, that this Court deems suitable and proper." (*Id.*)

On October 28, 2024, Defendants filed an Answer (Doc. No. 14) and a Partial Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c). (Doc. No. 15.) Defendants' 12(c) Motion seeks partial judgment as to Starlion's claims for fraud and civil conspiracy. (*Id.* at PageID# 72.) On November 27, 2024, Starlion filed its Motion to Amend pursuant to Fed. R. Civ. P. 15(a)(2) (Doc. No. 21) to provide additional details to its fraud and civil conspiracy claims and to eliminate Roberts from its civil conspiracy claim. (*Id.* at PageID#s 125-30.) That same day, Starlion additionally filed a Brief in Opposition to Defendants' 12(c) Motion. (Doc. No. 22.) On December 10, 2024, Defendants filed a Reply Brief in support of their 12(c) Motion (Doc. No. 24) and a Brief in Opposition to Starlion's Motion to Amend. (Doc. No. 25.) On December 17, 2024, Starlion filed a Reply Brief in support of its Motion to Amend. (Doc. No. 26.)

## II. Factual Allegations in the Proposed Amended Complaint

In its Proposed Amended Complaint,  Starlion proposes no changes to the general allegations of the Complaint or to each of the allegations regarding Starlion's breach of contract and unjust enrichment claims from paragraphs 2 through 49.  (Doc. No. 21 at ¶¶ 2-49.)

Starlion does, however, propose substantial additions to its fraud claim. Specifically, Paragraphs 51 and 52 of the Proposed Amended Complaint set forth additional details regarding JDS Pro's and Roberts' two allegedly fraudulent misrepresentations.  Paragraph 51 sets forth Starlion's allegation that JDS Pro and Roberts misrepresented "to Starlion that JDS Pro would receive proceeds for the Tests and pay Starlion for the Invoices 818, 977, and 1217." (Doc. No. 21-2 at ¶ 51.)  This Paragraph includes the following additional allegations:

> a. Defendants JDS Pro and Roberts made representations to Starlion that JDS Pro would receive proceeds for the Tests and pay Starlion for Invoices 818, 977, and 1217.  Roberts made the representations on behalf of JDS Pro and on his own behalf to Shadi Abdelwahab ("Abdelwahab"), Chief Executive Officer & President of Starlion, during a meeting on April 10, 2023 (prior to the execution of the Agreement for the Supply of COVID-19 Tests) in Miami, Florida at 7240 NW 32nd Street, Miami, Florida 33122.  Defendants JDS Pro and Roberts made this representation with the intent to mislead Starlion and did mislead Starlion.

> b. Roberts and JDS Pro's representation to Starlion was *fraudulent* because JDS Pro received some payment for the Tests delivered by Starlion,  but yet JDS Pro failed and/or refused to pay Starlion. Roberts and JDS Pro made the representation knowing that it was false because they never intended to pay Starlion for the Tests after delivery - which they did not.

> c. Defendants JDS Pro and Roberts' representation to Starlion that JDS Pro would receive proceeds for the Tests and pay Starlion for Invoices 818, 977, 1217 was material to Starlion's decision to contract with JDS Pro because Starlion was providing the Tests to JDS Pro on credit and the representation provided further assurance that JDS Pro would pay for the Tests and not divert the proceeds to other endeavors.

> d. Starlion justifiably relied on JDS Pro's assurance to pay Invoices 818, 977, 1217 because JDS Pro paid Starlion a substantial downpayment of $200,000 for the Tests and Roberts offered to personally guarantee JDS Pro's payment of the invoices.

(*Id.*)  Paragraph 52 sets forth Starlion's allegation that JDS Pro and Roberts misrepresented the source of JDS Pro's customers' insurance, as follows:

a.  Defendants JDS Pro and Roberts also represented to Starlion that virtually all JDS Pro customers to which Starlion delivered the Tests were covered by private insurance.  Roberts made the representations on behalf of JDS Pro and on his own behalf to Abdelwahab during the same meeting on April 10, 2023[,] in Miami, Florida at 7240 NW 32nd Street, Miami, Florida 33122.

b.  JDS Pro and Roberts representation about their customers insurance coverage was *fraudulent* because JDS Pro submitted its requests for payment for the Tests to Medicare and/or Medicaid, not to private insurance companies.  Roberts and JDS Pro made the representation knowing that it was false because JDS Pro never intended to submit the claims to private insurance for payment - which it did not. Defendants JDS Pro and Roberts made this representation with the intent to mislead Starlion and did mislead Starlion.

c.  Furthermore, Roberts and JDS Pro's representation that virtually all JDS Pro customers to whom Starlion delivered the Tests were covered by private insurance was material to Starlion's decision to contract with JDS Pro because private insurance companies process repayment faster than Medicare or Medicaid.  In other words, because of the bureaucracy involved with Medicare and Medicaid, repayment to JDS Pro by Medicare and/or Medicaid would have taken longer compared to private insurance, which in turn would have delayed JDS Pro's payment to Starlion for the Tests.  JDS Pro and Roberts knew that Starlion wanted to avoid any  dealings with Medicare and/or Medicaid because a delayed payment for the Tests by JDS Pro, would be fatal to Starlion 's operation and caused cessation of activities - which it did.

d.  Starlion justifiably relied on JDS Pro's representation that virtually all of the customers to whom Starlion delivered the Tests were covered by private insurance because Roberts offered on or around April 10, 2023[,] to share data with Starlion in support of that representation.  JDS Pro subsequently did share some data with Starlion which purported to show that most of JDS Pro's customers were covered by private insurance.  The data, however, turned out to be fraudulent because the customers were not covered by private insurance.

(*Id.* at ¶ 52.)  The Proposed Amended Complaint also alleges in Paragraph 55 that Starlion suffered the following damages:

a.  Starlion borrowed the funds with which it bought the Tests provided to JDS Pro. Starlion's monthly interest payment on the loan is approximately $40,000.  Starlion

7

borrowed the funds and agreed to the interest because it relied on JDS Pro and Roberts' representations that the claims would be submitted to private insurance and that Invoices 818, 977, 1217 would be promptly paid. Because of [sic] JDS Pro and Damon failed to pay Starlion for the Tests, Starlion is now liable for accumulated interest on the loan.

b. Starlion contracted with United Parcel Service ("UPS") for the delivery of the Tests to JDS Pro's customers based on JDS Pro and Roberts' fraudulent statements. As a result Starlion presently owes UPS approximately $850,000 in delivery fees. UPS is presently attempting to collect the amount owed to it and is threatening a lawsuit.

c. Because of JDS Pro and Roberts' fraudulent conduct and resulting damages, Starlion has been unable to operate, to generate profit, and to pay its own creditors. As a result, Starlion had judgment awarded against it for $551,000 in favor of CTK Co. Ltd. and $1,119,215.30, in favor of iPromo, LLC.

d. Because of JDS Pro and Roberts' fraudulent misconduct and the resulting damages. Starlion had no operating capital, was forced to lay off its employees, and had to cease operation - which caused substantial financial detriment to Starlion.

e. Because of JDS Pro and Roberts' fraudulent conduct and the resulting damages, Starlion was unable to pay rent for its facility at 7240 NW 32nd Street, Miami, Florida 33122 and was evicted.

f. Because of JDS Pro and Roberts' fraudulent conduct and the resulting damages, Starlion was unable to operate and to generate revenue to pay approximately $1,600,000 of debt owed to Diska, LLC for the purchase of tablets. As result, Starlion faces substantial payment of interest/penalties and principal relating to the tablets.

g. Because of JDS Pro and Roberts' fraudulent conduct and the resulting damages, Starlion was unable to operate and to generate revenue to pay for two plastic molding machines to manufacture plastic folks [sic], spoons, plates, and to-go boxes for restaurants, from which Starlion expected to generate substantial revenue.

h. Because of JDS Pro and Roberts' fraudulent conduct and the resulting damages, Starlion was unable to operate and to generate revenue to fulfil [sic] orders placed by its other customers.

(*Id.* at ¶ 55.) The Proposed Amended Complaint retains the allegation that "Defendants JDS Pro and Roberts' conduct was intentional and evidences the degree of malice necessary to support an award of punitive damages." (*Id.* at ¶ 56.)

8

Lastly, the Proposed Amended Complaint does not name Defendant Roberts in its claim for conspiracy set forth in Count V. Instead, the Proposed Amended Complaint provides that JDS Pro (and JDS Labs) "agreed and conspired among themselves to defraud Starlion regarding the Tests, as explained in Count IV above" and that "JDS Pro and JDS Labs are not interrelated companies." (*Id.* at ¶¶ 62, 63.) In fact, Starlion alleges "JDS Pro and JDS Labs are separate legal entities" and "[t]he only commonality between the two companies is the fact that Roberts was or is a member of both companies, but not the sole member[,]" and that "JDS Pro is not a wholly owned subsidiary of JDS Labs or vice versa." (*Id.* at ¶¶ 63-64.) Starlion also traces the damage from the conspiracy to the same damages as those "explained in Paragraph 55(a)-(h) above" and it retains the allegation that "JDS Pro and JDS Labs' conduct was intentional and evidences the degree of malice necessary to support an award of punitive damages." (*Id.* at ¶¶ 63-64.)

## III. Standard of Review

### A. Fed. R. Civ. P. 15

Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). However, if amending the complaint is 'futile,' the court need not grant a motion to amend. *See Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "An amendment is futile when, after including the proposed changes, the complaint still 'could not withstand a Rule 12(b)(6) motion to dismiss.'" *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 737 (6th Cir. 2022) (quoting *Rose v. Harford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)). In other words, when a defendant opposes a plaintiff's motion to amend under Rule 15 as futile, the court looks to the "substance of the proposed amendment" to

9

determine if the proposed amended complaint could withstand a Rule 12(b)(6) motion to dismiss. *See Beydoun*, 871 F.3d at 469 (quoting *Roskam Baking Co., Inc. v. Lanham Machinery Co., Inc.*, 288 F.3d 895, 906 (6th Cir. 2002)).

**B. Fed. R. Civ. P. 12(c)**

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).

Where, as here, the defendant has both moved for judgment on the pleadings under Rule 12(c) and has opposed the plaintiff's subsequent motion to amend under Rule 15(a)(2) as futile, the "inquiry into whether the amended complaint would be futile merges—indeed, entirely overlaps—with the Rule 12(c) question."  *Kue v. North*, 2024 WL 3537650 at *3 (6th Cir. July 25, 2024).  "The same standard for deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim applies to a Rule 12(c) motion for judgment on the pleadings."  *Showman v. Q Corp. Holdings, LLC*, 2024 WL 4336373 at *5 (N.D. Ohio Sept. 27, 2024) (citing *Roth v. Guzman*, 650 F.3d 603, 605 (6th Cir. 2011)). Therefore, this Court must analyze the allegations of Starlion's Proposed Amended Complaint to determine if it could survive a motion to dismiss under Rule 12(b)(6).

Under Fed. R. Civ. P. 12(b)(6), the court may dismiss a claim where the claimant has failed to "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When deciding a motion

to dismiss under this rule, the function of the court is to test the legal sufficiency of the complaint. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). The court must construe the complaint in the light most favorable to plaintiffs, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, legal conclusions and unwarranted factual inferences are not entitled to a presumption of truth. *See Twombly*, 550 U.S. at 555; *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (the Court is "not bound to accept as true a legal conclusion couched as a factual allegation.").

Additionally, the Court must read Rule 12(b)(6) in conjunction with Rule 8(a)(2)'s requirement that a plaintiff need only offer "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555). Although specific facts are not required to meet the basic minimum notice pleading requirements of Rule 8, a complaint must give the defendant fair notice of what the plaintiff's legal claims are and the factual grounds upon which they rest. *See Bassett v. Nat'l Collegiate Ath. Ass'n*, 528 F.3d 426, 437 (6th Cir. 2008). The plaintiff's obligation to provide the grounds for relief "requires more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Id.*

## IV. Analysis

In their Motion for Judgment on the Pleadings, Defendants first argue that Starlion failed to state a claim for fraud because it did not plead fraud with the specificity required by Fed. R. Civ. P. 9(b). (Doc. No. 15 at PageID#s 74-77.) Specifically, Defendants assert that "nowhere in the

11

complaint does Plaintiff allege the time or place of the alleged misrepresentation or who made and received the alleged misrepresentation." (*Id*. at PageID# 75.) Defendants further argue that Starlion failed to allege why the alleged misrepresentations were material to its decision to contract with JDS Pro; why Starlion was justified in relying on a material representation that is not contained in the Agreement; or what specific injuries Starlion suffered as a result of the alleged fraud. (*Id.* at PageID# 76.)

Defendants next argue that Starlion failed to state a claim for either fraud or conspiracy because it failed to plead that it incurred any damages other than contract damages. (*Id*. at PageID#s 77-79.) Defendants note that, under the economic loss doctrine, Ohio courts generally preclude a party from asserting tort claims arising from a breach of contract. (*Id*.) Defendants assert that Starlion's fraud and conspiracy claims are subject to dismissal under this doctrine because "no matter how the 'wrong' is framed, the gravamen of the complaint is that JDS Pro and/or Damon Roberts failed to pay for the Tests – a contractual breach warranting contractual damages." (*Id*. at PageID# 79.)

Lastly, Defendants argue that Starlion's conspiracy claim fails as a matter of law because Starlion's underlying fraud claim fails for the reasons set forth above. (*Id*. at PageID#s 79-80.) Starlion further asserts that Starlion's conspiracy claim fails because it is barred by the intra-corporate conspiracy doctrine. (*Id*. at PageID#s 80-81.) Specifically, Defendants argue that while a conspiracy requires a combination of "two or more persons," Starlion's Verified Complaint alleges that JDS Pro, JDS Labs, and Roberts are "interrelated" and, therefore, "not separate persons for purposes of a conspiracy." (*Id*. at PageID#s 79-81.)

In response, Starlion filed a Brief in Opposition to Defendants' Rule 12(c) Motion (Doc. No. 22) and a Motion for Leave to Amend its Verified Complaint (Doc. No. 21).  In its Brief in Opposition, Starlion argues that Defendants' Rule 12(c) Motion should be denied because Starlion has cured any alleged pleading deficiencies in its Proposed Amended Complaint.  (Doc. No. 22 at PageID#s 146-153.)  Starlion then argues, in both its Brief in Opposition and its Motion for Leave to Amend, as follows.

Regarding its fraud claim, Starlion maintains that its Proposed Amended Complaint meets the heightened pleading standard for fraud claims under Rule 9(b) because (for both alleged misrepresentations) it clearly (1) specifies the statements Roberts/JDS Pro made that Starlion contends were fraudulent; (2) identifies Roberts as the person who made the fraudulent statements on his own behalf and on behalf of JDS Pro; (3) states where and when the statements were made; and (4) explains why the statements were fraudulent.  (Doc. No. 21-1 at PageID#s 110-12; Doc. No. 22 at PageID#s 146-49.)  Starlion further asserts that the Proposed Amended Complaint sufficiently alleges that Starlion suffered substantial damages as a result of JDS Pro's and Roberts' misrepresentations, i.e., the damages set forth in detail in Paragraph 55 of the Proposed Amended Complaint.  (Doc. No. 21-1 at 113-14; Doc. No. 22 at PageID# 150-51.)

Regarding its conspiracy claim, Starlion argues that "the intra-corporate conspiracy doctrine does not apply in this case because the proposed First Amended Verified Complaint, taken as true, does not allege JDS Pro and JDS Labs are interrelated" and, in fact, alleges that JDS Pro and JDS Labs are separate legal entities. (Doc. No. 21-1 at PageID# 115; Doc. No. 22 at PageID# 153.) Accordingly, Starlion maintains that the intra-corporate conspiracy doctrine does not defeat the proposed amendment to Count V of the original Verified Complaint.

13

In their Reply Brief in support of their Rule 12(c) Motion, Defendants note that Starlion failed to address the merits of any of Defendants' specific arguments with respect to the pleading deficiencies in the original Verified Complaint.  (Doc. No. 24.)  Therefore, Defendants assert, the Court should find that Starlion has essentially conceded that its original Verified Complaint fails to state a claim for fraud or civil conspiracy.  (*Id*.)

Defendants also filed a Brief in Opposition to Starlion's Motion for Leave to Amend.  (Doc. No. 25.)  Therein, Defendants argue that allowing Starlion to amend would be futile because "the new allegations contained in the Proposed Amended Complaint make it even more obvious that Plaintiff's claimed damages flow exclusively from Defendants' alleged failure to pay (i.e., breach of contract)."  (Doc. No. 25 at PageID#s 165-66.)  Defendants further assert (summarily and without citation to authority) that the damages outlined in proposed Paragraph 55 "were either anticipated costs . . . or arguable consequential damages arising from Defendants' alleged failure to pay the contract price," and, therefore, are barred by the economic loss doctrine.  (*Id*. at PageID# 168.)  Thus, Defendants maintain, amendment would be futile because Starlion's Proposed Amended Complaint would not survive a Rule 12(b)(6) Motion to Dismiss.  (*Id*.)  Lastly, Defendants note that while Starlion's proposed amendment "might skirt application of the intra-corporate conspiracy doctrine," its conspiracy claim nonetheless fails because Starlion's Proposed Amended Complaint fails to state an underlying claim for fraud.  (*Id*. at PageID#s 169-70.)

In reply, Starlion maintains that Defendants' futility argument fails because the economic loss doctrine does not apply to Starlion's fraudulent inducement claims.  (Doc. No. 26 at PageID#s 174-76.)  Specifically, Starlion argues that it has sufficiently alleged that JDS Pro and Roberts fraudulently induced it to enter into the Agreement and continue the business relationship when they

14

misrepresented (1) their willingness or intent to fully pay for the Tests, and (2) that virtually all JDS Pro's customers were covered by private insurance. (*Id.*) As such, Starlion asserts "the misrepresentations at issue here implicate duties that are distinct and independent from the Agreement or the parties' contractual duties" and, therefore, the economic loss doctrine does not apply. (*Id.*) Starlion further maintains that it has alleged damages based on JDS Pro's and Roberts' extra-contractual misrepresentations, which are "separate and distinct from losses arising from the breach of the Agreement," including (1) monthly interest of $40,000 owed on the money used to buy the Tests; (2) $850,000 in delivery fees owed to UPS; (3) $551,000 in debt owed to CTK Co, Ltd; (4) $1,119.215.30 in debt owed to iPromo, LLC; (5) lack of operating capital, layoff of employees, and cessation of operation; (6) eviction for failure to pay rent; (7) $1,600,000 in debt owed to Diska, LLC: and (8) lost business opportunities and profits. (*Id.* at PageID#s 177-79.) Starlion argues that these damages are not contract damages because they are not contemplated by or addressed in the Agreement. (*Id.*)

At the outset, the Court notes as follows. If even the Proposed Amended Complaint cannot survive dismissal under the Rule 12(b)(6) standard set forth above, then the Court has no reason to let Starlion file it. In other words, the Court would have no reason grant Starlion leave to replace one defective pleading with another—that is what would make such an amendment 'futile.' Thus, the Court evaluates the Proposed Amended Complaint to ensure it can survive a motion to dismiss *before* it lets Starlion file it. If it could not survive, the Court would therefore deny Starlion's Motion to Amend. However, if the Proposed Amended Complaint *can* survive a Rule 12(b)(6) motion to dismiss in that "the underlying facts or circumstances relied upon by a [Starlion] may be a proper subject of relief," the Court would instead deny Defendants' 12(c) Motion and grant Starlion leave

to amend to "afford[] an opportunity to test [Starlion's] claim[s] on the merits." *Foman*, 371 U.S. at 183.  Thus, the threshold question in resolving both Motions is whether the fraud and conspiracy claims in Starlion's Proposed Amended Complaint would survive a motion to dismiss under Rule 12(b)(6).

For the following reasons, the Court finds that they would.  Regarding Starlion's proposed amended fraud claim, the Court finds that this claim would survive a 12(b)(6) motion to dismiss because it is not barred by the economic loss doctrine.  Specifically, and as explained in more detail below, the Court concludes that he economic loss doctrine does not bar Starlion's proposed amended fraud claim for two reasons: (1) well-established Ohio precedent confirms that fraud is not subject to the economic loss doctrine because fraud is an intentional tort predicated on legal duties distinct from contractual duties; and (2) even if the economic loss doctrine required Starlion to plead damages distinct from its contract damages, the Proposed Amended Complaint meets that requirement.  Regarding Starlion's proposed amended civil conspiracy claim, Defendants' only argument is that the civil conspiracy claim depends on the success of Starlion's fraud claim and that because the economic loss doctrine bars the fraud claim, the civil conspiracy must fail too.  (Doc. No. 25 at PageID#s 169-68.)  Because the Court rejects Defendants' contention, the Court finds that Starlion's proposed amended civil conspiracy claim is not futile.

### A. The economic loss doctrine does not bar claims for fraud because fraud is an intentional tort.

The economic loss doctrine "generally prevents recovery in tort of damages for purely economic loss."  *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005).  "The well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable."

16

*Id.* (citation omitted).  Thus, "[i]n Ohio, the economic loss doctrine has two aspects.  First, it bars a plaintiff from recovering in negligence for purely economic damages.  Second, it prevents a plaintiff from recovering in tort for the conduct of a defendant that violates only a contractual duty rather than any free-standing duty of care."  *Ross v. PennyMac Loan Servs. LLC*, 761 Fed. Appx. 491, 496 (6th Cir. 2019).  However, the Sixth Circuit has also explained that "Ohio law makes an exception to the economic loss doctrine in cases where the defendant has committed an intentional tort."  *Id.* (citing *Eysoldt v. ProScan Imaging*, 957 N.E.2d 780, 785 (Ohio App. 1st Dist. 2011)).

Indeed, Ohio courts consistently hold that the economic loss doctrine does not apply to intentional torts, including claims for fraud.  *See, e.g.*, *Eysoldt*, 957 N.E.2d at 785 (holding that that the economic loss doctrine "applies only in negligence cases, not in cases involving intentional torts"); *TRAX Constr. Co. v. Reminderville*, 2021 WL 4477460 at *7 n.3 (Ohio App. 11th Dist. Sept. 30, 2021) (citing *Corporex*, 835 N.E.2d at 705) ("It is important to note that the seminal economic loss rule cases cited by appellants concern negligence claims, not intentional torts, such as fraud.  In this respect, those cases are factually different than this matter, which alleged an intentional tort – a matter outside the economic loss rule to the extent it is premised upon a duty independent of the contract at issue."); *Windsor Med. Ctr., Inc. v. Time Warner Cable, Inc.*, 167 N.E.3d 23, 29 (Ohio App. 5th Dist. 2021) (quoting *Corporex*, 835 N.E.2d at 705) ("A plaintiff may pursue such a tort claim if it is 'based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity.' These types of exempt claims may include negligent misrepresentation, breach of fiduciary duty, fraud, and conversion.").

Federal courts applying Ohio law reach the same result.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d 773, 815 (N.D. Ohio 2020) ("Numerous courts addressing operation

17

of the economic loss doctrine in other contexts refuse to apply it to bar intentional torts."); and *ODW Logistics, Inc. v. Karmaloop, Inc.*, 2014 WL 293816 at *6 (S.D. Ohio Jan. 27, 2014) ("Ohio's economic loss doctrine applies only in negligence cases, not in cases involving intentional torts[.]"). "[C]ourts have repeatedly rejected application of the doctrine to intentional torts." *Id.*[4]

In the tortious interference with business relations context, one court highlighted why the economic loss doctrine does not apply to intentional torts:

> It makes sense that the economic loss rule would be limited to negligence actions. In a tortious interference with business relations action, for example, any recovery will always be for purely economic loss. The tort is designed to redress economic losses

---

[4] There is extensive case law supporting the proposition that Ohio's economic loss doctrine does not apply to fraud claims. *See, e.g.*, *Bibbs v. Allstate Ins.*, 2024 WL 4124171 at *11 n.6 (N.D. Ohio Sept. 9, 2024) (declining to apply the economic loss doctrine to the plaintiffs' allegations of fraudulent inducement and promissory fraud because "[t]he Court is persuaded by the weight of authority in this district finding that the economic loss doctrine does not apply to intentional torts under Ohio law, including claims for fraud in the inducement and fraudulent misrepresentation."); *Sinmier LLC v. Everest Indem. Ins. Co.*, 666 F. Supp. 3d 690, 703 (N.D. Ohio 2023) (internal citations omitted) ("There is an exception to the economic loss rule for claims based upon a tort duty independent of contractually created duties . . . This exception has been applied in the context of intentional torts, fraud, and negligent misrepresentation."); *MRI Software, LLC v. Pac. Cap. Mgmt., Inc.*, 2016 WL 1436067 at *3 (N.D. Ohio Apr. 12, 2016) (internal citations omitted) ("The economic loss rule is generally only applied to negligence cases and not to intentional torts . . . Ohio courts and many courts in this district have held that this doctrine does not prevent a party from raising a claim for fraud in the inducement . . . [t]herefore, the economic loss doctrine does not justify dismissal of Pacific's fraud in the inducement and/or negligent misrepresentation claim."); *Pride of Hills Mfg. Inc. v. Range Res.-Appalachia, LLC*, 2011 WL 2116455 at *7 (N.D. Ohio May 27, 2011) (internal citations omitted) ("Fraud in the inducement is also an intentional tort under Ohio law. Summary judgment is denied as to Counts VIII [for fraud] and X [for civil conspiracy] because the economic loss rule does not preclude recovery as a matter of law."); *Hodell-Natco Indus., Inc. v. SAP Am., Inc.*, 2010 WL 6765522 at *11 (N.D. Ohio Sept. 2, 2010) ("As such, the Court finds SAP's argument that Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims are barred by the economic loss rule to be without merit."); *MyVitaNet.com v. Kowalski*, 2008 WL 2977889 at *8 (S.D. Ohio July 29, 2008) ("The dispositive teaching from Ohio's intermediate courts, however, is that the economic loss doctrine is limited in its application. Even assuming *arguendo* that the state law doctrine can potentially apply to intentional torts of the sort alleged in this action, case law provides that the doctrine ultimately cannot apply" to plaintiff's fraud claim). And, as noted above, it does not apply to intentional torts more generally. *See, e.g.*, *Metro. Title Agency, Inc. v. Fed. Express Corp.*, 2023 WL 2600397 at *6 (S.D. Ohio Mar. 22, 2023) ("Importantly, while the rule bars recovery for purely economic loss caused by negligence, the doctrine does not apply to intentional torts such as conversion."); *Houser v. PowerDot, Inc.*, 2022 WL 18863810 at *6 (N.D. Ohio July 11, 2022) (citing *Ross*, 761 Fed. Appx. at 498) ("Ohio law makes an exception to the economic-loss doctrine in cases where the defendant committed an intentional tort."); *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 790, 824 (N.D. Ohio 2022) ("Ohio caselaw clearly and uniformly limits application of this doctrine to negligence-based qualified nuisance claims and finds it does not apply to intentional torts, such as the intentional misconduct alleged by Plaintiffs."); *Cintas Corp. v. First Advantage Enter. Screening Corp.*, 2013 WL 12121962 at *3 (S.D. Ohio July 19, 2013) ("Though Defendant argues for the application of the economic loss doctrine, the doctrine has been held inapplicable to intentional torts under Delaware and Ohio law."); *Medpace, Inc. v. Biothera, Inc.*, 2013 WL 1386298 at *4 (S.D. Ohio Apr. 4, 2013) ("the economic loss doctrine does not bar Biothera's conversion claim because the doctrine does not apply to intentional torts.").

> when a defendant has unfairly and intentionally disrupted a plaintiff's business. A negligence cause of action, on the other hand, is designed to redress personal injury or injury to property. Moreover, the fundamental policy consideration underlying the economic loss rule—the inevitable absence of a duty independent of that created by a contract in a negligence action for purely economic loss—is missing in the intentional tort context, where duty is not an element of the claim.

*Reengineering Consultants, Ltd. v. EMC Corp.*, 2009 WL 113058 at *6 (S.D. Ohio Jan. 14, 2009) (internal citation omitted).

The economic loss doctrine does not bar a fraud claim because a defendant's socially imposed obligation in tort to avoid inducing another to *enter* a contract in the first place is categorically distinct from the defendant's duty to abide by its subsequently assumed contractual obligations. *See MedChoice Fin., LLC v. ADS All. Data Sys., Inc.*, 857 F. Supp. 2d 665, 671 (S.D. Ohio 2012) ("[F]raudulent inducement implicates a general duty to avoid wrongful conduct that induces a party to enter into a contract."). In other words, the duty to avoid engaging in fraudulent conduct to create the contract exists separately from the duty to avoid breaching an already-created contract. This court has explained:

> Ohio courts have held that fraudulent inducement claims, based on a party's intent not to perform their terms at the time of contracting are viable even if the claim arises from the same contractual relationship as the breach of contract claim. This is because the focus of the wrongful conduct in a fraud in the inducement or promissory fraud claim is not the conduct that causes a contractual or promissory breach, but the intent of the tortfeasor, at the formation of the contract or promise, to defraud the other party into entering into the agreement. The common-law duty not to deceive a party into entering the contract or agreement is, thus, independent and separate from a duty not to breach a contractual obligation. Under Ohio law, Plaintiff can maintain a fraud claim based on a theory of fraud in the inducement or promissory fraud alongside his breach of contract claim.

*King v. Hertz Corp.*, 2011 WL 1297266 at *3 (N.D. Ohio Mar. 31, 2011) (internal citations omitted). This Court follows the ample authority from Ohio courts and from federal courts applying Ohio law

19

to conclude that Ohio's economic loss doctrine does not bar a fraud claim because fraud is an intentional tort.[5]

That is dispositive because here, Starlion's Proposed Amended Complaint asserts a fraud claim.[6] It alleges that Defendants made two fraudulent misrepresentations. First, that "Roberts and JDS Pro made representations to Starlion that JDS Pro would receive proceeds for the Tests and pay Starlion for Invoices 818, 977, and 1217" but they "made the representation knowing that it was false because they never intended to pay Starlion for the Tests after delivery – which they did not." (Doc. No. 21-2 at ¶ 51.) Second, that JDS Pro and Roberts "represented to Starlion that virtually all of JDS Pro customers to which Starlion delivered the Tests were covered by private insurance" when that coverage "was material to Starlion's decision to contract with JDS Pro," yet they "made the representation knowing that it was false because JDS Pro never intended to submit the claims to private insurance for payment – which it did not." (*Id.* at ¶ 52.)

Accordingly, because the economic loss doctrine does not bar claims for intentional torts such as fraud, and because Starlion's Proposed Amended Complaint asserts a claim for fraud, the economic loss doctrine does not bar Starlion's claim for fraud against JDS Pro and Roberts.

---

[5] Fraud is an intentional tort because one of the elements of any fraud claim is that the defendant made the misrepresentation "with the intent of misleading [the plaintiff] into relying on it[.]" *Franco Marine 1, LLC v. Great Lakes Towing Co.*, 2018 WL 2985185 at *6 (N.D. Ohio June 14, 2018); *see also Jasar Recycling, Inc. v. Major Max Mgmt. Corp.*, 2010 WL 395212 at *9 (N.D. Ohio Jan. 22, 2010) ("fraud is also an intentional tort under Ohio law"); *Foster v. D.B.S. Collection Agency*, 2008 WL 755082 at *11 (S.D. Ohio Mar. 20, 2008) ("intent is a required element of a fraud claim under Ohio law."); *Kreiner, Uhlinger & Edmonds Co., L.P.A. v. State Farm Fire & Cas. Co.*, 1991 WL 302446 at *3 (Ohio App. 5th Dist. Dec. 23, 1991) ("fraud is an intentional tort, with 'intent' as one of its elements").

[6] Starlion recharacterizes its fraud claim as fraudulent inducement in its Reply. (Doc. No. 26 at PageID#s 174-76.) This distinction is immaterial, however, because the "elements of fraudulent inducement [are the] same as elements of fraud." *Med. Billing, Inc. v. Med. Mgmt. Scis., Inc.*, 212 F.3d 332, 338 (6th Cir. 2000) (citing *Spencer v. Huff*, 1998 WL 391948 at *3 (Ohio App. 4th Dist. July 2, 1998); *see also Franco Marine 1, LLC*, 2018 WL 2985185 at *6 (quoting *Chem. Bank of New York v. Neman*, 556 N.E.2d 490, 494 (Ohio 1990) (setting forth the elements of fraud).

**B. The Proposed Amended Complaint pleads damages in addition to Defendants' alleged breach of contract.**

Despite the above authorities establishing that the economic loss doctrine does not bar claims for fraud because it is an intentional tort not subject to Ohio's economic loss doctrine, Defendants' Brief in Opposition to Starlion's Motion to Amend cites several cases to support its contention that the economic loss doctrine bars Starlion's fraud claim. (Doc. No. 25 at PageID#s 168-69.) Defendants cite *PLC Corp. v. Brandywine Recovery Inc.*, 2015 WL 5852829 at *6-7 (N.D. Ohio Oct. 6, 2015) (citing *Med. Billing, Inc. v. Med. Mgmt. Sciences, Inc.,* 212 F.3d 332, 338 (6th Cir. 2000)), *Infocision Mgmt. Corp. v. Found. for Moral L. Inc.*, 2009 WL 2244166 at *4 (N.D. Ohio July 27, 2009), *Polytec Internacional v. Artco Glob. Grp., LLC*, 2023 WL 8600575 (S.D. Ohio Sept. 6, 2023), and *Jasmine-Jade Enters., LLC v. Borders Grp., Inc.*, 2009 WL 10715172 (N.D. Ohio Oct. 19, 2009), but their reliance on these authorities is misplaced for two reasons: (1) *PLC*, *Medical Billing*, and *Infocision* are inapposite because they concern the calculation of damages at the motion for summary judgment stage, not the pleading requirements at the motion to dismiss stage; and (2) the complaints in *Polytec Internacional* and *Jasmine-Jade* are factually distinguishable from the Proposed Amended Complaint at issue here.

First, Defendants' reference to *PLC* severs it from its essential context. Defendants cite *PLC* as follows: "[A] plaintiff 'must seek to recover damages apart from the mere loss of the bargain reached for a specified payment.' 'A plaintiff may not directly recover the amount owed under the contract based upon a tort theory–the plaintiff would only be able to recover other damages proximately caused by the fraud.'" (Doc. No. 25 at PageID# 167) (quoting *PLC*, 2015 WL 5852829 at *7 (quoting *Marine Direct*, 2007 WL 81842 at *2 and *Med. Billing*, 212 F.3d at 338)). From this, Defendants reason that "[t]o state a tort claim, a party must plead damages specific to the tort that are

21

separate and distinct from its contract damages."  (Doc. No. 25 at PageID# 167).  However, Defendants overlook that the court in *PLC* was discussing how to calculate damages for a fraud claim granted on the merits at the summary judgment stage, not the standard for pleading a fraud claim at the motion to dismiss stage.  The full text reads:

> Additionally, fraud damages must be limited to the injury actually arising from the fraud.  The tort injury must be unique and separate from any injury resulting from a breach of contract. While recovery of purely economic loss is permissible with a fraudulent inducement claim, a plaintiff must seek to to [sic] recover damages apart from the mere loss of the bargain reached for a specified payment.  A plaintiff may not directly recover the amount owed under the contract based upon a tort theory–the plaintiff would only be able to recover other damages proximately caused by the fraud.

*PLC*, 2015 WL 5852829 at *7 (cleaned up) (citing *Med. Billing* for the proposition that "any award of damages arising from [a] fraudulent inducement claim must be separate and distinct from the damages awarded on claim for breach of the contract.").  That matters, not only because the court in *PLC* acknowledges that "recovery of a purely economic loss is permissible with a fraudulent inducement claim," but because that court highlights that the plaintiff *can* recover for the damages "proximately caused by the fraud."  *Id.* (citing *Med. Billing*, 212 F.3d at 338).  *PLC* therefore does not support Defendants' conclusion that "to state a tort claim" such as fraud, the plaintiff "must *plead* damages specific to the tort[.]"  (Doc. No. 167 at PageID# 167) (emphasis added).  Rather, *PLC* and *Medical Billing* merely limit the plaintiff's eventual recovery on the fraud claim to those it "suffered as a result of its justifiable reliance on any fraudulent or negligent misrepresentation that is separate and distinct from the damages already awarded for the breach of contract."  *PLC*, 2015 WL 5852829 at *7 n.8.

 *Infocision Mgmt. Corp. v. Found. for Moral L. Inc.*, 2009 WL 2244166 (N.D. Ohio July 27, 2009) does not discuss the economic loss doctrine at all.  Rather, like *PLC*, *Infocision* discusses only

whether the plaintiff's evidence at the summary judgment stage was sufficient to entitle it to distinct damages on its fraud claim. *See id.* at *7. The court concluded that the plaintiff had not made that showing because it sought through its fraud claim only "the same damages [as] in its contract claim." *Id.* The plaintiff, the court concluded, lacked evidence to "show damages resulting specifically from fraud." *Id.* Thus, *Infocision* too does not help Defendants at this stage of the litigation.

Second, while *Polytec Internacional* and *Jasmine-Jade* do apply at the motion to dismiss stage, they help Starlion more than they help Defendants. The court in *Polytec Internacional* imposed an additional element that the plaintiff must plead beyond a separate legal duty: the fraud claim must include "actual damages attributable to the wrongful acts of the alleged tortfeasor which are in addition to those attributable to the breach." *Polytec Internacional*, 2023 WL 8600575 at *2 (quoting *Popovich v. Sony Music Entm't, Inc.*, 2005 WL 8171846 at *12 (N.D. Ohio Feb. 10, 2005)). But *Polytec Internacional* does not help Defendants because Starlion's Proposed Amended Complaint is factually distinguishable from the complaint at issue in that case. As Starlion correctly notes, the plaintiff in *Polytec Internacional* only alleged that it "was 'injured by the lack of payment' under the Contracts—which are the same damages Plaintiff alleges in its breach of contract claim." (Doc. No. 26 at PageID# 180) (citing *Polytec Internacional*, 2023 WL 8600575 at *3) (cleaned up). *Polytec Internacional*, however, limited its application of the 'separate damages' requirement only to the plaintiff's "complete failure to even plead such an allegation." 2023 WL 8600575 at *3. The court distinguished the plaintiff's conclusory allegations from those in *Cunningham Prop. Mgmt. Tr. v. Ascent Res. - Utica, LLC*, 351 F. Supp. 3d 1056 (S.D. Ohio 2018), where the court denied the defendant's motion to dismiss the plaintiff's fraud claim, reasoning as follows:

> It is also unclear at this stage of the litigation if recovery under both causes of action would produce duplicative damages. Dismissal of the fraud claim is therefore

> premature.  Of course, should [the plaintiff] ultimately prevail on her fraud claim, her recoverable damages would be limited to those separate and distinct from any damages awarded on her breach of contract claim.

*Id.* at 1067 (quoting *Lebo v. Impac Funding Corp.*, 2012 WL 630046 at *6 (N.D. Ohio Feb. 8, 2012)).

*Jasmine-Jade*, like *Polytec Internacional*, also involved a fraud claim based on the defendant's mere breach of the contract.  There, the plaintiff grounded its fraud claim in its allegation that the defendants returned the incorrect books in violation of their agreement, and the court applied the economic loss doctrine to bar the plaintiff's fraud claim because "what is in dispute is [the defendants'] failure to adhere to the terms of an agreement" so it dismissed the plaintiff's fraud claim because that claim "identifie[d] *no* alleged injury distinct from the contractual breach."  *Jasmine-Jade Enters., LLC*, 2009 WL 10715172 at *8-9 (emphasis added).

In summary, Defendants' cases show that where a plaintiff asserts a fraud claim on top of its breach of contract claim, the plaintiff has a high burden to successfully recover additional damages on its fraud claim *at the summary judgment stage.  See PLC*, 2015 WL 5852829 at *7.  At that stage, the burden is high because the plaintiff must marshal evidence that identifies distinct damages proximately caused by the defendant's fraudulent misrepresentations that are separate from any damages caused by the defendant's breach.  *See Med. Billing, Inc.*, 212 F.3d at 338-39 (holding that the plaintiff could only recover for "damages that could have arisen uniquely from the fraud" such that the plaintiff must identify "damages that flowed from the fraud but not from the breach of contract.").  But Defendants' present reliance on those cases is unfounded because this case is not yet at the summary judgment stage.  Rather, this case is at the motion to dismiss stage.  And at this stage, Defendants' cases illustrate that the plaintiff has a lower burden.  That burden is lower because even if the plaintiff's complaint alleges that the fraud and the breach caused "duplicative damages," the

plaintiff's fraud claim can still survive a motion to dismiss.  *See Polytec Internacional*, 2023 WL 8600575 at *3 (quoting *Cunningham*, 351 F. Supp. 3d at 1067). [7]  At this earlier stage of the litigation, the plaintiff need only avoid pleading that its injury for fraud is the lack payment on the contract.  *See id.*

Here, Starlion avoids that pleading insufficiency.  The Proposed Amended Complaint alleges at least some damages distinct from Defendants' alleged breach.  While Starlion alleges that it was injured by JDS Pro's and Roberts' lack of the $4,276,315.20 payment (Doc. No. 21-2 at PageID# 130), it *also* alleges eight (8) *other* sources of damages distinct from the lack of payment.  (Doc. No. 21-2 at PageID#s 128-29; Doc. No. 25 at PageID#s 167-68.)  Defendants' alleged failure to pay may have caused those downstream damages, but the damages are distinct from the mere fact that Defendants failed to pay Starlion.  Not only are Starlion's alleged damages distinct from the breach itself, but *Cunningham* shows that Starlion need not trace the source of those downstream damages directly to its fraud claim at the pleading stage.  Thus, the potential for overlap between the damages caused by Defendants' failure to pay and Defendants' misrepresentations is not fatal to Starlion's Proposed Amended Complaint, *see Polytec Internacional*, 2023 WL 8600575 at *3; *Cunningham*,

---

[7] *See also Mitsui Sumitomo Ins. Co. of Am. v. Vertiv Corp.*, 2024 WL 962742 at *5 (S.D. Ohio Mar. 5, 2024) (citing *Cunningham*, 351 F. Supp. 3d at 1067) ("[T]he Court permits Plaintiffs to plead in the alternative and allows both their contract and fraud claims to proceed at the pleading stage.  Of course, if Plaintiffs ultimately prevail on their fraud claim, their recoverable damages would be limited to those separate and distinct from any damages awarded on the contract claim."); *Price v. Gulfport Energy Corp.*, 2020 WL 5433683 at *2 (S.D. Ohio Sept. 10, 2020) (citations omitted) ("The plaintiff in *Cunningham* similarly pled claims of breach of contract, fraud, and unjust enrichment as Plaintiffs have in this case.  While in general plaintiffs cannot duplicate a breach of contract claim as a fraud claim under Ohio law, this Court found in *Cunningham* that it is unclear at this stage if both fraud and breach of contract claims would lead to duplicative damages, so dismissing the fraud claim is premature.  Plaintiffs can thus plead both breach of contract and fraud claims, but if Plaintiffs ultimately prove their fraud claim, then they would only be able to recover damages separate from any damages recovered from their breach of contract claims."); *G.C. Franchising Sys., Inc. v. Kelly*, 2021 WL 1209263 at *8 (S.D. Ohio Mar. 31, 2021) (denying motion to dismiss plaintiff's fraud claim on the same basis).

351 F. Supp. 3d at 1067), even if such overlap at later stages in the litigation must be untangled to prevent double recovery. *See Med. Billing, Inc.*, 212 F.3d at 338-39.

Even if Starlion were required to plead non-duplicative damages, the Proposed Amended Complaint meets that higher standard. In *Popovich v. Sony Music Entertainment, Inc.*, 2005 WL 8171846 (N.D. Ohio Feb. 10, 2005), the court explained that "[f]raud damages that are independent of contract damages are typically reliance or forbearance damages." *Id.* at *3. For instance, the court in *ITS Fin., LLC v. Advent Fin. Servs.*, LLC, 823 F. Supp. 2d 772, 783 (S.D. Ohio 2011) acknowledged that the plaintiff's fraud claim sought "damages distinct from and in addition to damages caused by [the defendant's] breach of contract" because "the damages sought were not contemplated by the Agreement[.]" *Id.* at 783 n.20.

Here, Starlion's Proposed Amended Complaint contains at least three reliance damages not contemplated by its Agreement with Defendants and which therefore exist independently of the damages flowing from Defendants' alleged breaches. In the Proposed Amended Complaint, Starlion alleges that it borrowed money to pay for the Tests and has incurred monthly interest payments of approximately $40,000. (Doc. No. 21-2 at PageID# 128, ¶ 55.) Starlion took out that loan "because it relied on JDS Pro and Roberts' representations that the claims would be submitted to private insurance and that Invoices 818, 977, and 1217 would be promptly paid." (*Id.*) Those costs are not traceable to Defendants' alleged breach because even if Defendants never breached the contract, Starlion would have been obligated to pay the interest on the loan. However, those damages *are* directly traceable to Defendants' alleged misrepresentations because if Defendants had not misrepresented their intent to abide by their contractual obligations and had not misrepresented the source of JDS Pro's customers' insurance, then Starlion would not have entered the Agreement and

26

taken out the loan.  Thus, the alleged misrepresentation—not the alleged breach—caused Starlion's injury.

So too with Starlion's allegation that it incurred $850,000 in delivery fees because it "contracted with United Parcel Service  ("UPS") for the delivery of the Tests to JDS Pro's customers based on JDS Pro and Roberts' fraudulent statements." (*Id.*)  Even if Defendants never breached the Agreement, Starlion would have incurred those fees.  But Starlion would not have incurred those fees if it never entered the agreement because, as Defendants note, they were "anticipated costs of performance[.]"  (Doc. No. 25 at PageID# 168.)

Starlion's allegation that it could not "operate to . . . fulfil [sic] orders placed by its other customers" also alleges distinct damages.  (Doc. No. 21-2 at PageID# 129.)  Starlion alleges that had it not entered the Agreement with Defendants, it could have fulfilled those orders.  Thus, damages resulting from its inability to fulfill other, potentially more lucrative orders to other customers would be directly traceable to Defendants' alleged misrepresentations, not to Defendants' subsequent breaches.

Defendants describe Starlion's remaining damages for its insolvency, layoffs, eviction, inability to pay Diska, LLC for tablets, and inability to afford two plastic molding machines as "arguable consequential damages arising from Defendants' alleged failure to pay the contract price." (Doc. No. 25 at PageID# 168.)  However, those downstream consequences may also result, at least in part, from Starlion's missed interest payments, unpaid UPS delivery fees, and the loss of Starlion's opportunity to sell Tests to other customers, i.e., the costs it incurred to perform under an agreement it otherwise would have not executed.

27

Thus, even assuming that the economic loss doctrine requires Starlion to plead distinct damages stemming from its fraud claim, the Court finds that the Proposed Amended Complaint sufficiently alleges distinct damages resulting from Defendants' misrepresentations for its fraud claim to survive the economic loss doctrine.

Accordingly, and for all the reasons set forth above, the Court finds that allowing Starlion to amend its fraud claim would not be futile.[8]  And, because Starlion's proposed amended fraud claim is not futile, the Court further finds that it would not be futile to allow Starlion to amend its civil conspiracy claim as well.  Starlion's Motion to Amend (Doc. No. 21) is, therefore, granted.

## V.     Conclusion

For all the reasons set forth above, the Court GRANTS Starlion's Motion to Amend (Doc. No. 21) and DENIES Defendants' 12(c) Motion (Doc. No. 15) as moot.  Starlion shall file its First Verified Amended Complaint on the docket within seven (7) days of the date of this Order.

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  February 25, 2025                            U. S. DISTRICT JUDGE

---

[8] The Court notes that, although Defendants argued that Starlion's original Verified Complaint failed to plead fraud with particularity, Defendants do not assert this argument with respect to Starlion's fraud claim in its Proposed Amended Complaint.

28